## DONATH *et al. v.* INSURANCE COMPANY OF NORTH AMERICA.

### *Partial loss.—Return of premium.*

Where an agent insures on account of his principal, though really for his own protection, there can be no recovery for a total loss, after a capture and restitution—the principal having accepted the property not lost or damaged; the loss, in such case, is but a partial one.

There can be no claim for return of premium, where the risk has once commenced, and the voyage is entire; otherwise, where the voyage is divided into parts, and on one of them, no risk has been run.

THIS cause was argued in March term last, on the following case stated for the opinion of the court. (a)

Case. The plaintiffs were in advance for money lent, and goods delivered, to Don Alvarez Calderon, according to their account stated (including commissions and premium of insurance), to the amount of $13,750 ; and addressed to the defendants, the orders of insurance, dated respectively the 22d of June, and 6th of July 1799, in these words :

" Philadelphia, June 22d, 1799.

" President and Directors of the Insurance Company of North America.

" GENTLEMEN.—Agreeably to your answer, we request you to insure $13,750 on sundry effects, shipped on board the schooner Daphne, captain Ripley, bound for Havana. This insurance is declared to be made by us, for and in behalf of Don Alvarez Calderon, king's attorney in the island of Cuba, on goods, or rather effects, they not being merchandise intended for trade, but wholly his property, consisting in clothing and wearing apparel, library, a vast quantity of house-furniture, coaches, &c., amounting together to $18,733, of which we only cover the above sum of $13,750, the same being the amount of our advances, inclusive of premium, commission, &c., at and from Philadelphia to Havana, on board *the Daphne, an American bottom and property, and the returns from Havana to Philadelphia on board the same schooner, or any other American vessel, but if remittance should be made to us in bills of exchange, for the whole or in part of the sum so insured by us, a return-premium of seven and a half per cent.

*464]

---

(a) The case was stated with a reference to the various documents read in evidence; but it is necessary to incorporate the substance of them here, with the statement.

shall be allowed us, on the amount that may be remitted in bills. We further warrant that Don Alvarez Calderon has all necessary passports and protections for himself, suite and property, from the British, Spanish and French ministers, which we have caused to be registered in Clement Biddle's office."

"Philadelphia, July 6th, 1799.

"President and Directors of the Insurance Company of North America.

"GENTLEMEN—Please to cancel the policy of insurance effected on goods or effects, shipped by us, on board the schooner Daphne, for account of Don Alvarez Calderon, for $13,750, as the same have been re-landed and loaded on board the brig Currier, captain McKeiver, on which you will please to transport the same insurance, and on the same conditions.

Jos. DONATH & Co."

Previously to these orders, the plaintiffs had entered into an agreement with Don Alvarez Calderon, dated the 11th day of June 1799, of which the material passages were these:

"The said Jos. Donath & Co. contract to furnish a suitable vessel for the passage of the said Don Andres Alvarez Calderon, his suite, and goods and effects, from this port of Philadelphia to Havana. To procure insurance to be made of the goods and effects of the said Don Andres Alvarez Calderon, for the said voyage, to the amount of commissions, premium and charges, and the said goods and effects inclusive, and to comprehend in like manner the sums of $2000, advanced him by Stephen Dutilh, such insurance to be made at and from Philadelphia to Havana, and at and from thence back to this port of Philadelphia, and the policies of insurance, and authority to recover the same, in case of loss, to remain and be vested in the said Joseph Donath & Co.

"And the said Andres Alvarez Calderon further covenants, promises and obliges himself to the said Joseph Donath & Co., to pay to the said Joseph Donath & Co., or their correspondent at Havana, the full amount of said sums to be by them advanced, and also for the freight and other sums to be by him paid as aforesaid at Havana, in specie, to be loaded on board any vessel at Havana that they may require, clear of duties or risk; or at the option of said Andres Alvarez Calderon, to pay the said amount in sugars, or other *produce, in which last case, all the freight, charges, com- [*465 missions at Havana, and risk of the said sugars or other produce of the said island of Cuba, shall be at the charge of the said Andres Alvarez Calderon, so that the net proceeds thereof, after deducting all charges, freight and insurance, as the same shall produce at Philadelphia, shall be to the credit of said Andres Alvarez Calderon, instead of the sum paid at Havana in specie. And it is declared and agreed by the said parties hereunto, that in case the said vessel should be captured, taken or lost on her said voyage, that the insurance to be recovered on the goods and effects, to be shipped and insured as mentioned in the third article before mentioned, shall be applied by the said Joseph Donath & Co., to the discharge of their advances, and in abatement or acquittance for so much of the bills or drafts to be drawn by the said Don Andres Alvarez Calderon for the said sums, so to be paid and advanced for his use by the said Joseph Donath & Co., as aforesaid."

On the 6th day of July 1799, Joseph Ball duly underwrote the policy for the defendants, and affixed their corporate seal, by which they insured goods on board the Currier outwards, and on board her, or any other good American vessel home, at and from Philadelphia to the Havana and back to Philadelphia, valued at $13,750, for a premium of twenty per cent. The property out was warranted to belong to Don Alvarez Calderon ; and that he had all necessary passports and protections for himself, suite and property, from the British, Spanish and French ministers, resident in the United States. It was also stated in the policy, that the property homewards was to be shipped by Don Alvarez Calderon, or by his order, for account of the plaintiff ; but if the remittance was made in bills of exchange, and not goods, there should be a return of seven and a half per cent. of the premium. The premium was duly paid ; the warranty in the policy contained was complied with and performed ; the policy has always remained in the possession of the plaintiffs ; and the goods were shipped and consigned, as specified in the invoice and bill of lading, to wit, by Joseph Donath & Co. "for Don Alvarez, to Peter Blain, or his assigns," at the Havana. On the 19th June, and 8th July 1799, the plaintiffs wrote two letters to Peter Blain, the plaintiffs' agent named in the bill of lading, inclosing a copy of the contract with Don Calderon, and desiring him to secure payment before the goods were delivered ; to which letters they received answers, dated respectively the 18th and 31st of October 1799, stating the refusal of Don Calderon to pay the drafts, and his desire that the plaintiffs would seek redress from the underwriters. The brig Currier, in the policy named, sailed from Philadelphia, on the 10th of July 1799, on the voyage insured, with the property insured on board ; and while lawfully prosecuting the voyage, to wit, on the 31st of July 1799, she was captured by the British privateer *schooner Charlotte, Captain Thrift, and carried into New Providence, on the 3d day of August ensuing, where James McKeiver, master of the said brig, entered a protest. The brig and cargo were libelled in the vice-admiralty court, at New Providence, and were both condemned, except the property in the policy insured, touching which the following proceedings were had at New Providence.

\*466]

On the 26th of August 1799, Don Calderon petitioned the court of vice-admiralty, stating that he was possessed of passports from the British minister, &c., and praying restitution of his effects. On the 2d of September, the judge pronounced sentence, which, so far as it relates to the present question, expressed a doubt upon the construction of the British minister's passport ; and directed an inquiry to be made, whether it was the minister's intention to protect the effects of Don Calderon, to the extent claimed.(a)   On the

---

(a) The opinion of the judge of the court of vice-admiralty (Judge KELSALL), upon the general character and operation of diplomatic passports, appears sufficiently interesting, to justify its insertion at length.

Decree. "The only shipment in this vessel, that has occasioned me any hesitation, is that of Don Alvarez. This gentleman is a Spanish subject, but to exempt his property (of the value of eight or ten thousand dollars) from the usual consequence of capture, he has produced a paper, which has given rise to no small argument and discussion. It is a letter of license from his majesty's ambassador with the American states, Mr. Liston, by which the commanders of vessels of war are requested to allow Don Alvarez to pass, with his domestics, baggage and effects. It is said, that this paper, from its language, not being mandatory, never was designed by Mr. Liston to be viewed as a safe-conduct ; that it is merely an expression of civility, a complimentary act,

Donath v. Insurance Co. of North America.

12th of September 1799, all the goods were *restored to Don Calderon, on his giving security to abide the final decree, except a trunk of valu-

---

intended to procure to Don Alvarez polite treatment, and to protect himself, servants, baggage, and the customary *viatica*, or articles necessary for his use during the voyage, and no more; but by no means to enable him to carry furniture, carriages and other goods, to so great an amount as the property in dispute; that the document is not in the usual and proper form; and finally, the right of ambassadors, to protect by their licenses, more than has been here conceded to them, has been contested, on the ground, that it would defeat the operation of the prize act.

"The safe conduct of ambassadors will not, I apprehend, be often the subject of consideration here; and still more rarely will it happen, that there will be any greater occasion to dispute or deny the privilege claimed, than there exists in the present. If, however, the right of ambassadors to grant licenses, whereby enemy, or contraband goods may be protected from capture, during their passage through the sovereign's dominions (which is the case more especially alluded to by Blackstone, 1 Com. 259-60), or even to the territories of the enemy, which is the case here, be admitted in its fullest extent; still, it must be granted, that to insure proper respect to his act, attention should be paid to the forms prescribed or recommended by the writers on the law of nations; I mean, as Vattel expresses it, to enumerate and categorically express everything intended to be comprehended. Here, no enumeration has been made; but, instead thereof, a word has been inserted, of an import so general, that it may be construed to include anything and everything, of any amount and of any kind. I may, I trust, without derogating in the least from the respect due to his excellency, the ambassador, be permitted to doubt, whether, when he wrote the passport, he really meant to give it the full purport of which it is susceptible.

"The situation of judges of the vice-admiralty courts is well known to Mr. Liston. If, on the one hand, they are bound to respect the right of ambassadors, there are, also, duties to fulfil towards those who claim the benefits of the prize act. And hence, I do conclude, that in extending the privileges or immunities of a passport, beyond what is commonly done, he would have adopted a term of more precise and determinate signification, than the one he has used. Besides, it is very evident that Mr. Bond, the consul, who, I dare say, did see this license, and who ought, and I presume, does know better than any person here, what the ambassador really intended, takes no notice whatever of ' effects,' but confines his consular license or pass, which he granted eight days subsequent to that of Mr. Liston, to the persons and baggage of Don Alvarez and his servants. Don Alvarez himself, too, by insuring so carefully against capture, seems to have entertained a different opinion of this safe-conduct at Philadelphia, from that which he holds in this place. I will not, though, take upon me to say, that it is not possible, but that Mr. Liston might have been aware of the purpose to which his passport was intended to be applied; and that he might have deemed this a fit occasion, for the exercise of the extraordinary powers attached to his station and character. If this prove to be the case, I shall dismiss the libel, and leave the captors, if they think themselves aggrieved, to seek redress elsewhere. My duty, therefore, in the first place, is to be satisfied of what was the ambassador's meaning. For this purpose, I decree, that an exact enumeration of the articles (exclusive of the baggage, the books, and everything necessary for the prosecution of his voyage, which, if it has not been done, I direct may be immediately given up) that have been shipped by Don Alvarez, be made out, and that it be transmitted to his excellency, the ambassador, with a request that he would certify to this court, whether any or what things therein specified, were intended by him to be protected from capture by his license. In making this enumeration, I trust, that the greatest care will be used to prevent injury; and that the same be done in the presence of some person appointed by the claimant."[1]

[1] Upon receiving Mr. Liston's explanatory certificate, the whole of the property was ordered to be restored absolutely.

able articles, which had been lost after the capture; and for which the judge refused to make the captors responsible.

The property received by Don Alvarez Calderon, in consequence of those proceedings, was carried by him to the Havana, but never delivered to the said Blain, in the bill of lading mentioned, nor accounted for to the plaintiffs.

On the 31st day of August, and the 1st of October 1799, the plaintiffs abandoned the property insured to the defendants, stating in the former letter, particularly, that "they had received orders from Don Calderon to do so;" and thereupon, demanded payment for a total loss: which the defendants refused to pay, but offered to pay an average loss on the goods damaged and stolen. Don Alvarez Calderon has not paid to the plaintiffs the whole, or any part of their advances before mentioned: and no property insured on the homeward passage, has been shipped by him or his order, for *468] account of the plaintiffs, nor hath any part of *the remittances in the policy mentioned, been made in bills of exchange.

The questions for the opinion of the court are: 1st. Whether, under all the circumstances, the plaintiffs had an insurable interest in the property, mentioned in the policy, out and home, or either? 2d. Whether, if they had such interest, it is sufficiently insured by this policy, to entitle them to recover in the present action, as for a total loss? 3d. Whether, if they are not entitled to recover as for a total loss, they are entitled to recover as for a partial loss, and to what amount? 4th. Whether they are entitled to a return of premium on the return-voyage, and to what amount? It is further agreed, that the judgment of the court shall be rendered by them, in such form and for such sum, if any, as shall be best calculated to effectuate their opinion upon the foregoing questions.

The cause was argued, in March term, 1806, by *Levy* and *Dallas*, for the plaintiffs; and by *Ingersoll* and *Hopkinson*, for the defendants.

For the *plaintiffs*, it was insisted: 1st. That the advance and lien gave them an insurable interest in the effects of Don Calderon; Park 282; 1 W. Bl. 103; 1 Burr. 489; Park 267, 269; 8 T. R. 154; Park 11; 3 Burr. 1410; Park 270; 8 T. R. 13; 1 Bos. & Pul. 315, 323, 216; 6 T. R. 478, 483; 1 Marsh. 81, 91, 111, 112; 2 Bos. & Pul. 240, 75; that the nature of their interest was fully communicated to the defendants; that they had taken every precaution to secure the lien, by retaining the possession of the effects, and consigning them to their agent at the Havana, to be delivered to Don Calderon, only upon repayment of the money advanced; that the capture took from the plaintiffs the possession of the property, and with it, their lien; thereby constituting a total loss, on which they had a right to abandon (2 Burr. 694; 2 Emerig. 188, 194–5; 3 Poth. lib. 3, c. 3, art. 1, § 3); that the restitution to Don Calderon was not a restitution to the plaintiffs; but on the contrary, was destructive of their possession and lien; and that although the goods were, in fact, afterwards carried to the Havana by Don Calderon, they were never delivered at the port of destination, to the consignee of the plaintiffs, within the spirit and meaning of the policy, any more than if they had been carried thither by the captors. 2d. That the defendants have virtually acknowledged the right of the plaintiffs to recover, by offering to pay an average loss upon the property damaged and stolen. 3d. That, at all

Donath v. Insurance Co. of North America.

events, the policy contemplates two distinct adventures ; to wit, an outward cargo, and a remittance, either in cargo, or in bills of exchange (providing, in the latter case, for an abatement of seven and *a half per cent. [*469 premium), and as no risk has been run of either kind, upon the return-voyage, there should be a proportional return of premium. Park 367 377–8 (5th edit.); 3 Burr. 1237; 2 Marsh. 564, 567, 569, 561–71; 1 Bos. & Pul. 172.

For the *defendants,* it was insisted, 1st. That their contract was with Don Calderon, through the agency of the plaintiffs ; that the plaintiffs never had an insurable interest, or, if they had, they have not insured it; for the insurance is made on the effects of Don Calderon, on his account and risk; and, although they are consigned to Blain, at the Havana, it is expressly " for Don Calderon " (1 Ld. Raym. 271; 12 Mod. 156); that there was no idea of a lien, in the origin of the transaction, but a perfect reliance on the honor of Calderon; that, although two persons may insure distinct interests in the same subject, it must be upon distinct contracts, for distinct premiums; and that Don Calderon, in case of a legal loss, might have sued on the policy, though he had paid his debt to the plaintiffs; and thus, if they might sue, their debt not being paid, two interests would be insured by the same contract, for a single premium. 2d. That the defendants had complied with their contract, the property being restored to, and remaining in, the possession of its owners, for whom the insurance was made, at its port of destination; and that the insurance was against the perils of the sea, and of war, but it was not an insurance against the misconduct of Don Calderon, in retaining the property, without paying the debt. 3d. That the voyage was entire ; for an entire premium of twenty per centum, varying the amount of the premium, but not the entirety of the voyage, acccording to the manner in which the returns should be made. Park 440, 377; 2 Marsh. 572; Doug. 751.

The cause was held under advisement, until the 17th of January 1807, when the opinions of the judges who had heard the argument were delivered.

TILGHMAN, Chief Justice.—My opinion on the first point will be rendered unnecessary, by the opinion which I shall deliver on the second point; because, granting that the plaintiffs possessed an insurable interest, I am of opinion, that it clearly appears from the facts stated, that they ordered no insurance, and that no insurance was made for them, in any other capacity, than as agents of Don Alvarez Calderon: consequently, they cannot recover for a total loss, as Don Alvarez Calderon has accepted that part of the property which was saved, and thereby made his election to claim only for a partial loss. The instructions of the plaintiffs for effecting the insurance, were to insure expressly for and on behalf of Don Alvarez Calderon. It is true, they insured only $13,750, although the whole effects of [*470 their principal amounted to $18,733; *and they give the reason, that $13,750 covered the amount of their advances, including premium, commissions, &c. The defendants might well suppose, that the plaintiffs were to hold this policy for their own security, in case of loss, although the insur-

405

ance was made for Don Alvarez Calderon; and that this was the fact, appears from the agreement, dated the 11th of June 1799. But it is not stated, that this agreement was disclosed to the defendants: on the contrary, there is one circumstance which goes far towards convincing me that no such disclosure was made. It is this: by the agreement, the outward cargo was to be at the risk of Don Alvarez Calderon, but the memorandum at the foot of the policy contains a covenant, that the inward cargo should be shipped on account of the plaintiffs. The plaintiffs contend, that they had a lien on the goods, and that it so appears by the bill of lading, and their letter to Mr. Blain. But in my opinion, those papers prove directly the contrary. By the bill of lading, the goods are deliverable, for Don Alvarez Calderon, to P. Blain; so that Don Alvarez Calderon might have compelled Blain to give him possession of the goods, before the expiration of the fifteen days, which were allowed for payment of the plaintiffs' demand. The plaintiffs, in their first letter to Blain, declare that the respectability of Don Alvarez Calderon's character was a sufficient guarantee for the honorable execution of his agreement. And even in their second letter, although they began to apprehend difficulty from the capricious temper of the Don, they gave no intimation of any expectation, that their agent should hold the goods until he received payment of their demand.

Suppose, Don Alvarez Calderon had paid the plaintiffs' account; can it be contended, that he could not recover for his own use, on this policy, the amount of the loss, that he has actually sustained? And if he could, does it not inevitably follow, that the plaintiffs cannot recover for their own use? If they can, one insurance, effected for one premium, may be made to cover two different interests, vested in different persons. Besides, the plaintiffs attempt, most unreasonably, to make the defendants answerable for a risk, which they never meant to run; that is, for the integrity and good conduct of Don Alvarez Calderon. And after that gentleman has received the property, which was restored to him by the British court of admiralty, the defendants are called on to answer for it, as being lost. To render the impropriety of this demand the more complete, the plaintiffs made the abandonment, on which they found their claim, expressly by order of Don Alvarez Calderon. Nothing can be clearer than the plaintiffs, throughout the whole of the transaction of this insurance, acted not for themselves, but as the agents of Don Alvarez Calderon.

3d. On the third point, there is no difficulty. Undoubtedly, the plaintiffs *471] may recover for the partial loss, sustained by Don Alvarez Calderon. *The defendants do not deny it. I presume, the parties can easily adjust this loss. Indeed, I understood so, from what fell from Mr. Levy, in the course of his argument.

4th. The last question in this case is, whether the plaintiffs are entitled to a return of any part, and how much, of the premium? The general rule is, that where the voyage is entire, and the risk has once commenced, there shall be no return of premium. But when, by the course of trade, or the agreement of the parties, the voyage is divided into distinct parts; and on one of these parts, no risk has been run, there shall be an apportionment of the premium, and part shall be returned. A voyage may be entire, though the ship is to go to a number of different places, and to take in different cargoes. But if, in the contract of insurance, there are certain contingen-

cies introduced, which, at certain periods of the voyage, may operate so as to make the insurance void, it has been considered, that in such cases, the voyage may be supposed to have been divided, in the contemplation of the parties, into distinct parts. As in the case of *Stevenson* v. *Snow* (3 Burr. 1237), which was an insurance of a ship " at and from London to Halifax, warranted to depart with convoy from Portsmouth." The convoy was gone, before the ship arrived at Portsmouth; and by the judgment of Lord Mansfield, and the whole court of king's bench, there was a return of part of the premium. In the case before us, it appears to have been in contemplation of the parties, that on the voyage from the Havana home, there might be contingencies, which would either avoid the policy, for that part of the voyage, or lessen the risk, so far as to require a part return of premium. The goods shipped on the outward voyage, are warranted to be the property of Don Alvarez Calderon: it was doubtful, whether any goods would be shipped on the inward voyage. If a remittance was made in bills of exchange, there was to be a return of seven and a half per cent., part of the premium. If goods were shipped, they were warranted to be on account of the plaintiffs. It seems to be the spirit of this agreement, that the voyage may be divided; and that if no goods were shipped, there should be a return of seven and a half per cent.

On the whole of the case, I am of opinion, that the plaintiffs are entitled to recover for a partial loss, and a return premium of seven and a half per cent., with interest from the commencement of the action. (a) I do not think, that they should be allowed interest for a longer time, because they demanded more than they were entitled to, and have put the defendants to the expense of contesting their claim for a total loss.

Yeates, Justice, being indisposed, sent his opinion, in writing, to the court, and it was read by the prothonotary. He concurred in the decision, that the plaintiffs were entitled to recover a partial loss, for the goods lost and damaged; but he considered *the voyage as entire, and consequently, was opposed to the claim for a return of premium. [*472

Smith and Brackenridge, Justices, concurred, generally, in the sentiments delivered by the chief justice.

And judgment was entered for the plaintiffs, accordingly ; the *quantum* to be calculated by the parties. (b)

---

(a) The assured is entitled to a return of the premium, if the goods upon which the insurance was effected have never been put on board the vessel, or if she was not seaworthy, at the time the risk would have commenced, if it had commenced at all. Scriba *v.* Insurance Co. of North America, 2 W. C. C. 107. But fraud on the part of the assured, will bar him from demanding a return of premium. Schwartz *v.* United States Ins. Co., 3 Id. 170.

(b) On the question of interest, *Dallas* took the liberty of suggesting to the court, after the opinions were delivered, that the practice had uniformly been, to allow interest on the amount actually recovered, upon the expiration of thirty days, after depositing the proofs of loss; and that, on principle, the underwriters could only discharge themselves from 'nterest or costs, by a tender, or payment into court, of the sum due. But the Chief Justice answered, that the subject had been considered, and was now decided.